# United States Court of Appeals
## For the Eighth Circuit

_____

No. 19-2800
_____

United States of America

*Plaintiff - Appellee*

v.

Antonio M. Slater

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Western District of Missouri - Kansas City

_____

Submitted: September 25, 2020
Filed: November 5, 2020

_____

Before COLLOTON, GRUENDER, and GRASZ, Circuit Judges.

_____

GRUENDER, Circuit Judge.

The sole issue in this appeal is whether the district court[1] erred by denying Antonio Slater's motion to suppress evidence. We affirm.

---

[1]The Honorable David Gregory Kays, then Chief Judge, United States District Court for the Western District of Missouri, adopting the Report and Recommendation of the Honorable Lajuana M. Counts, United States Magistrate Judge for the Western District of Missouri.

On November 28, 2015, at 7:29 p.m., an individual called 911 to report he had just been the victim of an armed robbery in Kansas City, Missouri. The individual gave his name, telephone number, and location (E. 12th St. and Prospect Ave. in Kansas City). He also provided a description of his assailants: two black males wearing brown hoodies and dark pants, one of whom was armed with a handgun. At 7:31 p.m., dispatch relayed the description of the assailants to officers in the area. A little over a minute later, dispatch further relayed a change to the incident location (E. 12th St. and Brooklyn Ave. in Kansas City) as well as the report that the assailants stole two cell phones and a wallet and had fled the scene on foot in an unknown direction.

Officers Timothy Griddine and Charles Hill were a few blocks west of the reported locations when they heard these broadcasts. They began canvassing the area in their unmarked patrol vehicle to search for the assailants. A few minutes after the first broadcast, the officers turned left onto E. 10th St. after traveling south on Woodland Ave., an intersection still a few blocks west of the reported locations. Immediately upon turning onto E. 10th St., Officer Griddine saw two black males walking west on the sidewalk on the north side of the street. He noticed that one of them was wearing a "tan" or "brown hoodie" (it turned out to be a khaki jacket over a gray hoodie), which caught his eye. He did not identify the color of the other individual's clothing beyond perceiving it to be "dark." Thinking these two individuals could be the assailants, Officer Griddine stopped his vehicle, got out, and ordered them to stop. They complied.

Officer Griddine then explained that he was investigating a robbery, and he proceeded to frisk the individual he had observed wearing the brown hoodie. He did not find any weapon or anything incriminating. Officer Griddine then frisked the other individual, Antonio Slater. Officer Griddine discovered a gun in his right pocket, at which moment Slater "[l]owered his right arm, right on top of [Officer Griddine's] hand," as if he were going to remove Officer Griddine's hand or try to escape. Officer Griddine then attempted physically to restrain Slater, who struggled with Officer Griddine for several minutes. Slater was eventually handcuffed. His

- 2 -

name was run through a law enforcement database, which reported that he was a convicted felon. He was then arrested.[2]

A grand jury indicted Slater for one count of being a felon in possession of a firearm. *See* 18 U.S.C. § 922(g)(1); *id.* § 924(a)(2). He moved to suppress evidence of the firearm, arguing that Officer Griddine's stop and frisk were not supported by reasonable suspicion. After holding a hearing, the magistrate judge recommended denying the motion, and the district court adopted that recommendation after neither party objected to it. Slater subsequently waived his right to a jury trial, so the matter proceeded to a bench trial. He was found guilty and sentenced to 120 months' imprisonment. Slater appeals, challenging only the district court's ruling on his motion to suppress.

"Because [Slater] failed to object to the magistrate judge's report and recommendation, we review any challenge to the district court's factual findings for plain error, and we review legal conclusions *de novo*." *United States v. Camberos-Villapuda*, 832 F.3d 948, 951 (8th Cir. 2016). As his counsel pointed out at oral argument, Slater is not challenging any factual findings in this appeal. Rather, he contests only the legal conclusion that sufficient justification existed for Officer Griddine's stop and frisk of him.

Slater does not argue that the stop and frisk exceeded the bounds of what is permitted under *Terry v. Ohio*, 392 U.S. 1 (1968), so we consider only whether sufficient justification existed for this *Terry* stop and frisk, *see White v. Moulder*, 30 F.3d 80, 82 (8th Cir. 1994) ("Our review is limited to issues specifically raised and argued in the [Appellants'] brief."). "A *Terry* stop is justified when a police officer is 'able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.'" *United States v. Houston*, 920 F.3d 1168, 1172 (8th Cir. 2019) (quoting *Terry*, 392 U.S. at 21).

---

[2]Later, it was determined that Slater and his companion were not the assailants.

"During a *Terry* stop, 'when an officer is justified in believing that the individual . . . he is investigating at close range is armed and presently dangerous to the officer or to others,' the officer may conduct a pat-down search 'to determine whether the person is in fact carrying a weapon.'" *United States v. Bustos-Torres*, 396 F.3d 935, 943 (8th Cir. 2005) (brackets omitted) (quoting *Terry*, 392 U.S. at 24).

Under *Terry*, both the stop and the frisk for weapons during the stop must be supported by reasonable suspicion. *United States v. Powell*, 666 F.3d 180, 186 n.5 (4th Cir. 2011) ("[T]he general reasonable suspicion standard is the same in both instances."). For the stop, the officer must have "reasonable suspicion that 'criminal activity may be afoot.'" *Houston*, 920 F.3d at 1172 (quoting *Terry*, 392 U.S. at 30). For the frisk, the officer must have "reasonable suspicion that a person with whom [he is] dealing might be armed and presently dangerous." *United States v. Green*, 946 F.3d 433, 439 (8th Cir. 2019).

"In determining whether reasonable suspicion exists, we consider the totality of the circumstances in light of the [officer's] experience and specialized training." *Id.* We consider "what the officer reasonably knew at the time" rather than assessing the existence of reasonable suspicion "with the vision of hindsight." *United States v. Hollins*, 685 F.3d 703, 706 (8th Cir. 2012). Although the reasonable-suspicion standard requires more than "a mere hunch . . . the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." *United States v. Arvizu*, 534 U.S. 266, 274 (2002) (internal quotation marks omitted). In considering the totality of the circumstances, we "may not view individual elements of suspicion in isolation," but rather "we must view the individual elements in context, *i.e.*, in light of one another, and give 'due weight' to the officer's inferences when assessing the overall level of suspicion." *United States v. Sanchez*, 955 F.3d 669, 675 (8th Cir. 2020).

The primary issue here is whether Officer Griddine had reasonable suspicion that Slater and his companion were the assailants so as to have justification to stop

them in the first place.  At the time of the stop, Officer Griddine knew that two black males reportedly wearing brown hoodies and dark pants were fleeing on foot from the scene of a robbery that had occurred a few blocks east just a few minutes beforehand.  When he turned onto E. 10th St., Officer Griddine observed two black males walking west, away from the scene of the robbery, and he noticed that one of these individuals was wearing a "tan" or "brown hoodie" and that the other individual's clothing was "dark."

In light of the totality of these circumstances, we conclude reasonable suspicion existed to justify the stop.  To this end, we find *United States v. Quinn*, 812 F.3d 694 (8th Cir. 2016), sufficiently analogous to be instructive.  In *Quinn*, an officer in Kansas City responded to a radio call to be on the lookout for two suspects involved in a late-night wreck of a stolen vehicle, one of whom reportedly was armed.  *Id.* at 696.  The two suspects were last seen running north from the scene of the accident, and they were described as "white males," one wearing a "blue hooded sweatshirt" and the other wearing a "white t-shirt."  *Id.*  Approximately forty minutes after the search began, the officer "observed a white male . . . wearing a dark t-shirt and jeans" emerge from an alley and begin walking north, away from the crime scene.  *Id.*  These observations, coupled with the fact the individual was "constantly looking over his left shoulder towards" the officer's police cruiser, prompted the officer to conduct a brief stop and frisk of the individual, which led to his arrest and conviction.  *Id.* at 696-97.  The individual challenged the stop, arguing the officer lacked reasonable suspicion.  *Id.* at 697.  We affirmed the district court's conclusion that reasonable suspicion existed.  *Id.* at 698.  Although the individual only "partly matched" the description of the suspects, he was observed "within a few blocks" of the crime scene not too long after the crime was reported, and he was walking north (like the suspects reportedly were) at a time of night "when few pedestrians were around" while "react[ing] suspiciously" to the presence of a police officer.  *Id.*

The circumstances in this case resemble the circumstances in *Quinn*.[3] Officer Griddine was on the lookout for two black males wearing brown hoodies and dark pants fleeing on foot from the scene of the robbery. When he turned onto E. 10th St. (a few blocks west of the reported locations of the crime) just a few minutes after the crime reportedly occurred, he observed two black males wearing clothing that resembled the description of the assailants' clothing and walking west away from the crime scene. That is, Slater and his companion were two men, they matched the generic description of the assailants, they were in close temporal and geographical proximity to the crime, their clothing partly matched the assailants' clothing, and they were walking away from the crime scene. This combination of factors supports a finding of reasonable suspicion justifying the stop. *See id.*

Having concluded that reasonable suspicion existed to justify the stop, we have no trouble concluding further that reasonable suspicion existed to justify the frisk. Officer Griddine heard a report from dispatch that one of the assailants was armed with a gun, and he did not find a gun after frisking Slater's companion. "[W]here nothing in the initial stages of the encounter serves to dispel [the officer's] reasonable fear for his own or others' safety, he is entitled . . . to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons . . . ." *Terry*, 392 U.S. at 30.

Slater raises a number of counterarguments as to why reasonable suspicion was lacking, but none are meritorious. First, Slater contends that reasonable suspicion was "based on nothing more than his temporal and geographical proximity

---

[3]Slater tries to distinguish *Quinn* by noting that the officer there observed the defendant's "suspicious reaction" at the sight of a police officer, whereas here there is no evidence that Slater or his companion reacted suspiciously at the sight of Officers Griddine and Hill. But the reasonable-suspicion standard does not require police first to "corroborate their suspicions with observations of erratic or suspicious behavior" before they lawfully may conduct a *Terry* stop. *See United States v. Arthur*, 764 F.3d 92, 98-99 (1st Cir. 2014). "[C]ircumstances other than suspicious behavior" may suffice, *see id.* at 99, and they do in this case. The absence of suspicious behavior is thus a distinction without a difference in this instance.

to the reported offense," which he asserts is not enough. But, as discussed above, Officer Griddine's reasonable suspicion was supported by more than mere temporal and geographical proximity. Slater's first argument is unavailing.

Second, Slater argues that the assailants' generic description as black males was too vague to give Officer Griddine reasonable suspicion to stop Slater and his companion given Officer Griddine's testimony at the suppression hearing that he was canvassing a "predominantly African-American area" and that "it wouldn't be unusual to see black persons walking in that area." That is, Slater asserts that here, unlike in *Quinn*, there were other "potential suspects in the area who match[ed] the description" of the assailants, and this fact precludes a finding of reasonable suspicion. *See Quinn*, 812 F.3d at 699 ("[G]eneric suspect descriptions and crime-scene proximity can warrant reasonable suspicion *where there are few or no other potential suspects in the area who match the description*." (emphasis added)); *see also Reid v. Georgia*, 448 U.S. 438, 441 (1980) (per curiam) (indicating that "circumstances describ[ing] a very large category of presumably innocent" persons do not give rise to reasonable suspicion by themselves).

But there is more here than just a matching generic suspect description and crime-scene proximity. Officer Griddine observed that Slater's companion had a "tan" or "brown hoodie" on and that Slater wore "dark" clothing, resembling the description of the assailants' brown hoodies and dark pants. Slater and his companion were walking away from the crime scene, consistent with the report that the assailants had fled the scene on foot. And Slater and his companion were two men, like the assailants. These circumstances along with the generic description and crime-scene proximity, when viewed in their totality, suffice to meet "the modest burden required to satisfy the reasonable suspicion standard." *See Arthur*, 764 F.3d at 98.

Third, Slater argues that, even if reasonable suspicion existed to stop his companion due to his companion's outerwear resembling the assailants' brown hoodies, reasonable suspicion was lacking to stop him because his clothing (he

claims it was a "bulky winter coat") did not resemble sufficiently a brown hoodie. Even so, we disagree that the discrepancy between his clothing and the description of the assailants' clothing outweighs the other factors supporting reasonable suspicion. *See Quinn*, 812 F.3d at 699 & n.2 (finding reasonable suspicion even though the officer "relied on a relatively generic suspect description" that the stopped individual "did not match perfectly" because his clothing did not resemble the description of the suspects' clothing).

Furthermore, investigating officers must be allowed to account for the possibility that some descriptive factors supplied by victims or witnesses may be incorrect. *United States v. Abdus-Price*, 518 F.3d 926, 931 (D.C. Cir. 2008). After all, "[n]o single factor is dispositive" in the reasonable-suspicion "assessment," as "the issue is whether 'taken together they amount to reasonable suspicion.'" *United States v. Michael R.*, 90 F.3d 340, 346 (9th Cir. 1996) (quoting *United States v. Sokolow*, 490 U.S. 1, 9 (1989)); *see also United States v. Hightower*, 716 F.3d 1117, 1121 (8th Cir. 2013) ("Even if a single factor . . . , when viewed in isolation, did not support a finding of reasonable suspicion, our precedent prohibits such a fragmented approach to reasonable suspicion."). As *Quinn* demonstrates, *see* 812 F.3d at 699 & n.2, one discrepancy between a suspect's description and an individual's appearance—particularly a discrepancy involving a readily modifiable aspect of one's appearance such as outerwear—does not vitiate reasonable suspicion that otherwise exists in light of other circumstances, *see also United States v. Street*, 917 F.3d 586, 594 (7th Cir. 2019) ("*Terry* does not authorize broad dragnets, but it also does not require perfection or precision."); *Arthur*, 764 F.3d at 98 (finding reasonable suspicion based on the totality of the circumstances notwithstanding "discrepancies between the information available to [the officer] and the actual appearance of the appellant and his companion at the time of the stop").

For the foregoing reasons, we affirm.

_____