# United States Court of Appeals
### For the Eighth Circuit

_____

No. 24-1482

_____

Ryan Wolterman

*Plaintiff - Appellant*

v.

Shawn Syverson, Individually and in his official capacity as a law enforcement officer; Gregory Baloun, Individually and in his official capacity as Sheriff; Dickinson County, Iowa

*Defendants - Appellees*

_____

Appeal from United States District Court
for the Northern District of Iowa - Western

_____

Submitted: September 17, 2025
Filed: January 14, 2026

_____

Before SMITH, GRUENDER, and SHEPHERD, Circuit Judges.

_____

GRUENDER, Circuit Judge.

This appeal concerns a suit brought under 42 U.S.C. § 1983 and Iowa law by Ryan Wolterman against Dickinson County and two of its employees, Sheriff

Gregory Baloun and Deputy Sheriff Shawn Syverson. Wolterman appeals the district court's[1] entry of summary judgment in the defendants' favor. We affirm.

## I. Background

On November 8, 2020, Dickinson County Deputy Sheriff Shawn Syverson responded to a call for service related to a fight at the Captain's Getaway bar in Arnolds Park, Iowa. Deputy Syverson later testified that, after arriving on the scene, he spoke with a female witness who pointed down an alley towards an individual who was wearing a green shirt and who was walking away from the area. The individual was approximately 100 yards away. Deputy Syverson asserts that he then got in his patrol car to follow the individual down the alley but soon lost sight of the individual. In the patrol car, Deputy Syverson's body camera began recording.[2]

Believing the individual "had either fled or was hiding," Deputy Syverson began to search, first on foot, then again in the patrol car. While in his patrol car, Deputy Syverson spotted Ryan Wolterman walking on the sidewalk. Deputy Syverson later testified that Wolterman was wearing "the same type of jacket" as the individual he had seen, and the jacket appeared to be an "olive-greenish color." Moreover, Wolterman was "right in the area" where Deputy Syverson had last seen the individual, about a minute's walk away from the Captain's Getaway bar.

---

[1]The Honorable C.J. Williams, Chief Judge, United States District Court for the Northern District of Iowa.

[2]Wolterman disputes Deputy Syverson's testimony regarding events that occurred before the camera began recording. However, he fails to present any contrary evidence and thus fails to establish a genuine dispute of material fact. *See Fatemi v. White*, 775 F.3d 1022, 1040 (8th Cir. 2015) ("To establish a genuine issue of material fact, [plaintiff] may not merely point to unsupported self-serving allegations, but must substantiate allegations with sufficient probative evidence that would permit a finding in [his] favor." (citation modified)).

Deputy Syverson exited his patrol vehicle to question Wolterman. Within fifteen seconds, Milford Police Department Officer Jesse Hoss joined the pair. In response to Deputy Syverson's inquiries, Wolterman stated that he had witnessed the fight but denied involvement. Wolterman disputed Deputy Syverson's assertions that he was wearing a green sweatshirt and that his knuckles were red and swollen. Flashlight beams revealed that Wolterman was wearing a zip-up Carhartt-style jacket that appeared brown or olive-green, depending on the lighting. Deputy Syverson requested identification several times until Wolterman complied.

Deputy Syverson—who later testified that he had observed "an odor of alcohol beverages"—asked Wolterman how much he "had to drink tonight," to which Wolterman replied, "None of your business. I'm walking." Wolterman asserts that, at this point, Deputy Syverson nodded at Officer Hoss.[3] Wolterman turned to face Officer Hoss and asked, "Are you going to arrest me now?" Officer Hoss proceeded to handcuff him, informing him "You're not under arrest; you're just being detained." Deputy Syverson assisted by holding Wolterman's left elbow and shining his flashlight to assist Officer Hoss as he fastened the handcuffs.

Officer Hoss, trailed by Deputy Syverson, walked Wolterman back to Captain's Getaway, where Deputy Syverson left them to speak with another witness. While he was still speaking with the witness, an individual came up to Deputy Syverson and told him that she was "99.99 percent sure" that Wolterman was not involved in the fight. After that witness walked away, Deputy Syverson told the other suspect that Wolterman was going to be arrested for public intoxication "anyways" because he was being stupid. After being transported to the jail, Wolterman gave a breath sample that indicated he had a blood alcohol content of .016. This result can be caused by consuming a single alcoholic drink. Nonetheless, Wolterman was charged with public intoxication. He pled not guilty. Nearly eight months later, the State voluntarily moved to dismiss the charge.

---

[3]As Deputy Syverson was wearing the body camera, the video of the event does not show whether Deputy Syverson actually nodded.

Wolterman sued Deputy Syverson, Dickinson County Sheriff Gregory Baloun, and Dickinson County, bringing claims under 42 U.S.C. § 1983 and Iowa law.[4] He alleged that Deputy Syverson violated his right to be free from unreasonable seizure under the Fourth and Fourteenth Amendments and the Iowa Constitution and that Sheriff Baloun and Dickinson County failed to properly train and supervise or to adopt adequate policies to prevent this violation as required by *Monell v. Dep't of Soc. Servs. of N.Y.C.*, 436 U.S. 658 (1978). He alleged pursuant to Iowa law that Deputy Syverson was liable for false arrest, that Sheriff Baloun and Dickinson County were liable for negligent training and supervision, and that Dickinson County was liable under the doctrine of *respondeat superior*. The defendants moved for summary judgment and Wolterman cross-moved for partial summary judgment.

The district court granted summary judgment to the defendants, denying Wolterman's motion. As relevant here, it determined (1) that Deputy Syverson was entitled to qualified immunity because he had not violated Wolterman's right to be protected from unreasonable seizure under the Fourth and Fourteenth Amendments; (2) that Dickinson County is not subject to *Monell* liability; (3) that Deputy Syverson had not committed false arrest under Iowa law; (4) that Sheriff Baloun and Dickinson County had not committed negligent supervision and (5) that Dickinson County was not liable based on a *respondeat superior* theory. Wolterman appeals, arguing that each of these determinations was in error.

## II. Discussion

We review a district court's grant of summary judgment *de novo*, viewing the record in the light most favorable to the nonmoving party—here, Wolterman—and

---

[4]Wolterman also sued the City of Arnolds Park, Arnolds Park Chief-of-Police Alan Krueger, Officer Yungbluth (the officer who filed the criminal complaint against Wolterman), and Officer Hoss. The parties jointly stipulated to dismiss those claims pursuant to a settlement agreement.

giving him the "benefit of all reasonable inferences." *See De Mian v. City of St. Louis*, 86 F.4th 1179, 1182 (8th Cir. 2023). Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case." *Flores v. United States*, 689 F.3d 894, 902 (8th Cir. 2012).

## A.

We first address Wolterman's claim that Deputy Syverson violated his federal right to be free from unreasonable seizure. The district court granted summary judgment to Deputy Syverson based on qualified immunity. "Qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (citation modified). The doctrine "gives government officials breathing room to make reasonable but mistaken judgments" and "protects all but the plainly incompetent or those who knowingly violate the law." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (citation modified). To determine whether an official is entitled to qualified immunity, "we consider (1) whether the official's conduct violated a constitutional right; and (2) whether the violated right was clearly established." *Stanley v. Finnegan*, 899 F.3d 623, 627 (8th Cir. 2018) (citation modified).

Wolterman asserts that Deputy Syverson violated his constitutional rights under the Fourth Amendment because he (1) lacked reasonable suspicion to stop and question him about the bar fight and (2) lacked probable cause to execute an arrest.

First, Deputy Syverson had reasonable suspicion to stop Wolterman. A police officer may effect a temporary investigative detention if the officer has reasonable suspicion that criminal activity "may be afoot." *Terry v. Ohio*, 392 U.S. 1, 30 (1968). An officer is considered to have "reasonable suspicion" if he has "a particularized

and objective basis for suspecting the particular person stopped of breaking the law." *Heien v. North Carolina*, 574 U.S. 54, 60 (2014) (citation modified). Reasonable suspicion is "not readily, or even usefully, reduced to a neat set of legal rules," but is evaluated based on the totality of the circumstances. *United States v. Quinn*, 812 F.3d 694, 697 (8th Cir. 2016). An officer might consider factors like the time of day or night, location, and the suspect's behavior when he becomes aware of the officer's presence. *Id.* at 697-98. "[A] person's temporal and geographic proximity to a crime scene, combined with a matching description of the suspect, can support a finding of reasonable suspicion." *Id.* at 698.

The district court concluded that Deputy Syverson had reasonable suspicion to stop Wolterman because he matched the suspect's description and was temporally and geographically proximate to the altercation. We agree. Deputy Syverson testified that a witness informed him that a person wearing a green shirt was involved in the fight. That witness pointed to an individual, approximately 100 yards away, whom Deputy Syverson saw and pursued. Upon losing sight of the suspect, Deputy Syverson believed the suspect "had either fled or was hiding." While searching the area, Deputy Syverson came across Wolterman, whom he believed to resemble the suspect he had seen from a distance. Deputy Syverson believed that Wolterman's jacket was an "olive-greenish color." Further, Deputy Syverson came across Wolterman near where he had lost sight of the suspect—in other words, near where he believed the suspect might have been hiding. Based on the totality of these circumstances, Deputy Syverson had reasonable suspicion to conduct a *Terry* stop. *See id.* at 699. ("[G]eneric suspect descriptions and crime-scene proximity can warrant reasonable suspicion where there are few or no other potential suspects in the area who match the description.").

Wolterman resists this conclusion. He argues that he did not match the suspect's description because he was wearing a brown zip-up Carhartt coat, not a green sweatshirt. He also argues that he was not in a suspicious location because he was only one minute's walk away from the scene of the altercation and Deputy Syverson had been searching for at least five minutes. Further, Wolterman argues,

because he continued walking normally when the patrol vehicle approached, Deputy Syverson should not have believed that Wolterman had recently fled or hid. We do not think these facts undermine Deputy Syverson's reasonable suspicion. Deputy Syverson relied on more than just the color of the jacket—he saw the suspect from a distance and believed Wolterman to resemble him and to be wearing a similar type of jacket. Further, Deputy Syverson was operating in poor lighting that made it difficult to discern the exact color of the jacket. And, because Deputy Syverson lost sight of the suspect nearby, he reasonably suspected that the suspect might still be in the immediate area. *See Navarette v. California*, 572 U.S. 393, 403 (2014) (noting that an officer "need not rule out the possibility of innocent conduct" to have reasonable suspicion). Deputy Syverson had reasonable suspicion to execute the *Terry* stop.

Second, Deputy Syverson did not violate Wolterman's constitutional rights by executing his arrest without probable cause because, as an assisting officer, he exercised reasonable reliance on Officer Hoss's probable cause determination. "An assisting officer may rely on the probable cause determination and follow the directions of an officer who is directing the arrest as long as the reliance is reasonable." *Baude v. Leyshock*, 23 F.4th 1065, 1074 (8th Cir. 2022) (citation modified). Officer Hoss, who was dismissed pursuant to a settlement agreement, directed the arrest. It was Officer Hoss—not Deputy Syverson—who made the decision to handcuff Wolterman and who escorted him away.[5] Deputy Syverson merely assisted by placing a hand on Wolterman's elbow and directing his flashlight beam to assist Officer Hoss as he fastened the handcuffs. He then trailed closely behind the pair as they walked back to Captain's Getaway. As an assisting—not directing—officer, Deputy Syverson was entitled to exercise reasonable reliance on Officer Hoss's probable cause determination. *See id.*

---

[5]Defendants assert that Officer Hoss merely detained Wolterman and that Officer Yungbluth, another Arnolds Park Officer on the scene, later conducted the arrest. This is irrelevant for purposes of our Fourth Amendment analysis. *See Chiaverini v. City of Napoleon*, 602 U.S. 556, 562-63 (2024) (noting pretrial detentions must be based on probable cause).

Wolterman resists this conclusion by pointing to his deposition testimony that he witnessed Deputy Syverson "signal" Officer Hoss to handcuff Wolterman. This fails to establish a genuine dispute of fact as to whether Officer Hoss directed the arrest and is thus responsible for establishing probable cause. Deputy Syverson and Officer Hoss were employed by different police departments, and Wolterman has presented no evidence to support the conclusion that Deputy Syverson exercised any authority over Officer Hoss such that a nod should be interpreted as an implied order. To the contrary, at oral argument, counsel for Wolterman conceded that no direct chain of command existed between Deputy Syverson and Officer Hoss.

Deputy Syverson reasonably relied on Officer Hoss's probable cause determination. Deputy Syverson had observed the odor of alcoholic beverages and, moments before, had reasonable suspicion that Wolterman was involved in the altercation. Moreover, Wolterman was uncooperative and hostile towards Deputy Syverson while being questioned. Although Deputy Syverson did not know why Wolterman was being arrested and later testified that he would not have arrested Wolterman for public intoxication based on his personal observations, as an assisting officer, Deputy Syverson did not need to independently establish probable cause. As Deputy Syverson later testified, "[Officer Hoss] can see things that I can't sometimes. I can see things that he can't sometimes. When another officer decides to place somebody in handcuffs, he might have prior knowledge. He might be noticing something that I'm not. I don't know why he placed [Wolterman] in handcuffs. That was not my call."

In sum, because Deputy Syverson had reasonable suspicion to effect a *Terry* stop and because he reasonably relied on Officer Hoss's decision to effect an arrest, Deputy Syverson did not violate Wolterman's Fourth Amendment right to be free from unreasonable search and seizure.

**B.**

We next address the denial of Wolterman's *Monell* claim against Sheriff Baloun and Dickinson County. "Absent a constitutional violation by an employee, there can be no § 1983 or *Monell* liability." *Stearns v. Wagner*, 122 F.4th 699, 704 (8th Cir. 2024) (citation modified). Because Deputy Syverson did not violate Wolterman's constitutional rights, the district court properly dismissed his *Monell* claim.

**C.**

We finally address Wolterman's false arrest, negligent supervision, and *respondeat superior* claims under Iowa law.

First, Deputy Syverson did not commit false arrest. An Iowa false arrest claim has two elements: "(1) detention or restraint against one's will, and (2) unlawfulness of the detention or restraint." *Thomas v. Marion Cnty.*, 652 N.W.2d 183, 186 (Iowa 2002). Wolterman's false arrest claim against Deputy Syverson fails to satisfy the second element. "A peace officer may make an arrest . . . [w]here the peace officer has reasonable grounds for believing that an indictable public offense has been committed and has reasonable grounds for believing that the person to be arrested has committed it." Iowa Code § 804.7 (2025). As discussed above, Deputy Syverson reasonably relied on Officer Hoss's decision to arrest; therefore, he reasonably believed that Wolterman had committed an indictable public offense.

Second, Wolterman's negligent supervision claim against Sheriff Baloun and Dickinson County fails. A necessary element of an Iowa negligent supervision claim is that "the employer knew, or in the exercise of ordinary care should have known, of its employee's unfitness *at the time the employee engaged in wrongful or tortious conduct*." *Est. of Harris v. Papa John's Pizza*, 679 N.W. 2d 673, 680 (Iowa 2004) (emphasis added). Because Wolterman failed to establish that a genuine dispute of

material fact exists as to whether Deputy Syverson ever engaged in wrongful or tortious conduct, his negligent supervision claim also fails.

Third, Wolterman's *respondeat superior* claim against Dickinson County likewise fails because he failed to raise facts suggesting that Deputy Syverson acted negligently. *See Godar v. Edwards*, 588 N.W.2d 701, 705 (Iowa 1999) ("[U]nder the doctrine of respondeat superior, an employer is liable for the negligence of an employee committed while the employee is acting within the scope of his or her employment.").

### III. Conclusion

For the foregoing reasons, we affirm the judgment of the district court.

_____